UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WI-LAN INC.,<br><br>                                Plaintiff,<br><br>     v.<br><br>RESEARCH IN MOTION CORPORATION; RESEARCH IN MOTION LTD.; MOTOROLA, INC.; UTSTARCOM, INC.; LG ELECTRONICS MOBILE COMM U.S.A.; AND LG ELECTRONICS, INC.,<br><br>                                Defendants. | Civil No.   10cv859-W (CAB)<br><br>**ORDER: (1) DENYING WI-LAN INC.'S MOTION TO COMPEL; AND (2) GRANTING IN PART AND DENYING IN PART QUALCOMM, INCORPORATED'S MOTION TO QUASH AND FOR PROTECTIVE ORDER**<br><br>**[Doc. Nos. 9 and 10.]** |

Before the Court are cross-motions regarding the production of discovery in response to a subpoena served by Wi-LAN Inc. ("Wi-LAN"), the plaintiff in a patent infringement lawsuit pending in the U.S. District Court for the Eastern District of Texas, No. 08-Civ-247 ("Texas Action"), on Qualcomm Incorporated ("Qualcomm"), a non-party to the Texas Action. Wi-LAN moves the Court for an order compelling Qualcomm to produce license agreements and business records required by the subpoena issued from this District. (Doc. No. 10.) Qualcomm moves to quash the subpoena and requests a protective order. (Doc. No. 9.) The motions were briefed in accordance with the Court's Scheduling Orders. (Doc. Nos. 8 and 19.) Oral argument was held on July 20, 2010. John C. Briody, Esq., appeared for Wi-LAN. David Dolkas, Esq., appeared for Qualcomm. Having considered the

submissions of the parties, and the arguments of counsel, Wi-LAN's Motion to Compel is **DENIED**; Qualcomm's Motion to Quash and for a Protective Order is **GRANTED in Part and DENIED in Part**.

## I. BACKGROUND

Wi-LAN holds a portfolio of patents in wireless and related technologies. Wi-LAN does not presently make or sell any products, but generates its revenue by developing and licensing its intellectual property rights. (Doc. No. 9-6.) Wi-LAN is the plaintiff in the Texas Action against Motorola, Inc., LG Electronics, and UTStarcom, Inc., alleging infringement of two of Wi-LAN's patents: U.S. Patent No. RE 37,802 ("the '802 patent") and U.S. Patent No. 5,282,222 ("the '222 patent").[1] Wi-LAN represents that the '802 patent is directed to CDMA technology that enables high speed data transmission in handsets over cellular networks. (Doc. No. 10-1 at 4.) The defendants in the Texas Action are accused of infringing this patent by making, selling, using or importing "mobile handsets and/or other products compliant with the CDMA2000 standard and/or the 802.11 standards that fall within the scope of at least one claim of the '802 patent." (Texas Complaint, ¶¶ 14, 16 and 18.) Wi-LAN also represents that the '222 patent is directed to OFDM technology that allows for high speed data transmission in handsets over the internet through wireless data networks. (Doc. No. 10-1 at 4.) The defendants in the Texas Action are accused of infringing this patent by making, selling, using or importing "mobile handsets and/or other products compliant with the 802.11 standards that fall within the scope of at least one claim of the '222 patent." (Texas Complaint, ¶¶ 15, 17 and 19.)

As a licensor of its patented technology, Wi-LAN seeks a reasonable royalty as compensatory damages from the defendants in the Texas Action for the alleged infringement of the '802 patent and the '222 patent.

Defendant Motorola alleges, by way of its counterclaim, that Wi-LAN is a member of the Institute of Electrical and Electronics Engineers ("IEEE"), a standards setting body, and was a

///
///
///

---

[1] Wi-LAN's Third Amended Complaint ("Texas Complaint"), attached as Exhibit B to the Declaration of Laura Handley, Doc. No. 1-2, at B62-69.

participant in the standards setting process for the OFDM standard 802.11.[2] Motorola further alleges that if its accused products that are compliant with the 802.11 standard infringe one or more of Wi-LAN's claims, Wi-LAN is obligated to offer licenses to the '802 patent and the '222 patent on fair, reasonable and non-discriminatory terms ("the RAND commitment"). Motorola contends that Wi-LAN is asserting its patents and demanding excessive royalties and injunctive relief in bad faith and violation of its RAND commitment to the IEEE and its members. (Motorola Counterclaim, ¶¶ 72-137.) Wi-LAN contends that the licensing terms it seeks from defendants in the Texas Action do not violate any RAND commitment.

### A. Qualcomm's Relationship to the Texas Action

Qualcomm is an industry leader in the development of CDMA and related technologies, employing over 16,000 people internationally.[3] Qualcomm develops and supplies CDMA-based integrated circuits and system software for wireless voice and data communication, multimedia functions and global positioning system products. (Lupin Declaration, ¶ 4.) Qualcomm's patent portfolio includes patents and patent applications filed globally, with approximately 12,600 U.S. patents and applications and approximately 59,000 foreign granted patents and applications. Qualcomm receives license fees as well as ongoing royalties based on worldwide sales by licensees of products incorporating or using Qualcomm's intellectual property under individualized license terms. (*Id.*, ¶ 5.) Qualcomm has approximately 175 licensees to its patent portfolio.(*Id.*, ¶ 6.) There is no standard license agreement for the Qualcomm patent portfolio. Standard draft agreements are used as a starting point for negotiations and are adapted depending on the scope of the license sought with regard to both products covered and rights granted, and may include cross license rights to other entities' patents. (*Id.*, ¶18.) All licensing negotiations and the terms of any particular license are subject to nondisclosure agreements and confidentiality provisions. (*Id.*, ¶9.)

///

---

[2]Motorola's First Amended Answer, Affirmative Defenses, and Counterclaims to Wi-LAN, Inc.'s Third Amended Complaint ("Motorola Counterclaim"), attached as Exhibit 12 to the Declaration of John Briody, Doc. No. 16-1 at 212-226.

[3]Declaration of Louis M. Lupin ("Lupin Declaration"), Doc. 9-11 at ¶¶ 3-4.

Qualcomm is not a party to the Texas Action. The defendants in the Texas Action are Qualcomm licensees. (*Id.*, ¶¶ 15, 16 and 17.) The defendants use Qualcomm CDMA chips in their products accused of infringement. Wi-LAN claims that the technology in the Qualcomm CDMA chipsets, which are CDMA standard compliant, satisfies essential claim elements or limitations in Wi-LAN's asserted patent claims. (Doc. No. 15 at 1.) Under a protective order, Qualcomm produced source code for its CDMA chips in response to a previous subpoena served by Wi-LAN in the Texas Action.

### B. The Issue Before the Court

Wi-LAN now seeks discovery from Qualcomm for the preparation of its compensatory damage claims in the Texas Action and also to respond to Motorola's counterclaim that Wi-LAN is in violation of its RAND commitment. On April 16, 2010,[4] Wi-LAN served a subpoena on Qualcomm for production of (1) Qualcomm's license agreements relating to its CDMA technologies and its OFDM technologies; (2) all license agreements between Qualcomm and Mediatek; (3) documents related to the negotiation of the license agreements; (4) documents related to Qualcomm's licensing practices; and (5) documents relating to Qualcomm's statement that a licensee's customers do not receive rights to any of Qualcomm's patents.[5] Qualcomm served timely objections to the subpoena, including objections based on relevancy, burden and confidentiality. (Doc. No. 9-7.) The parties attempted to negotiate the scope of the subpoena, but those negotiations failed. Wi-LAN therefore moved to compel production in response to the subpoena, somewhat modified, specifically requesting (1) all Qualcomm license agreements for CDMA and OFDM technology; (2) the license agreements between Qualcomm and third parties whose technology is included as part of Qualcomm's CDMA and OFDM standard licenses; and (3) the negotiation correspondence related to those licenses. (Doc. No. 10-1 at 8.) Contending this would require the production of approximately 175 confidential agreements and the review of millions of pages of documents, Qualcomm moved to quash the subpoena.

/ / /

---

[4]An amended subpoena was served on May 5, 2010, but the scope of the requests was unchanged.

[5]Exhibit 1 to the Declaration of Dave Dolkas, Doc. No. 9-3.

## II. LEGAL STANDARD

Wi-LAN's subpoena for the production of documents was served on Qualcomm pursuant to FED. R. CIV. P. 45(a)(1)(D)(2)(C). The general rules of discovery apply to subpoenas issued under Rule 45, including FED. R. CIV. P. 26(b)(1) that provides "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." The court, however, may limit discovery if the burden and expense of the proposed discovery outweighs its likely benefit. FED. R. CIV. P. 26(b)(2).

In this case, Qualcomm objected to Wi-LAN's subpoena in accordance with FED. R. CIV. P. 45(c)(2)(B). Having received timely objections, Wi-LAN moved for an order compelling the production and has burden to show appropriateness of the subpoena served on Qualcomm, a non-party. FED. R. CIV. P. 45(c)(2)(B)(i); *see also In re Natural Gas Commodity Litigation*, 235 F.R.D. 199, 208 (S.D.N.Y. 2005). Where discovery is sought from a non-party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of the production on the non-party. *Id.*

In addition to opposing Wi-LAN's motion to compel, Qualcomm moved to quash the subpoena pursuant to FED. R. CIV. P. 45(c)(3)(A) on the basis of undue burden and Rule 45(c)(3)(B) because it requires disclosure of confidential information.[6] The determination of a subpoena's reasonableness requires a court to balance interests served by complying with the subpoena against the interest served by quashing it. Determinations of whether subjecting a non-party to a subpoena would pose an undue burden are committed to the discretion of the court. *See Jones v. Hirschfeld*, 219 F.R.D. 71, 74 (S.D.N.Y. 2003).

## III. DISCUSSION

In the Texas Action, Wi-LAN will seek to establish a reasonable royalty for the use of its patents.[7] A reasonable royalty results from a hypothetical negotiation between a willing licensor and a willing licensee taking place when the infringement first began. *See ResQNet.com, Inc. v. Lansa, Inc.*,

---

[6] Qualcomm also moves for a protective order.

[7] Presumably Wi-LAN does not have, or is not relying upon, an established royalty as compensatory damages for the infringement of its inventions.

594 F.3d 860, 868 (Fed. Cir. 2010). "A comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation appears in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)." *Id.* at 869.[8]

Wi-LAN seeks Qualcomm's CDMA and OFDM licensing agreements asserting that they are probative of a reasonable royalty rate for the use of Wi-LAN's '802 patent and '222 patent because Qualcomm's licenses reveal what the industry pays for these technologies. (Doc. No. 10-1 at 2, 9.) Citing specifically factors 2, 12 and 15 of the *Georgia-Pacific* factors, Wi-LAN represents that Qualcomm's licenses are relevant to show rates paid by licensees for the use of other patents comparable to Wi-LAN's patents (factor 2); to show customary rates in the industry for the use of analogous inventions (factor 12); and to show rates upon which a licensor and licensee would have reasonably and voluntarily agreed (factor 15). (*Id.* at 10.) Wi-LAN contends that Qualcomm should be compelled to produce its CDMA license agreements because they reflect actual royalties being paid for CDMA technologies, including Wi-LAN's technology at issue in the Texas Action, and its OFDM license agreements because they reflect royalties paid for technology comparable to Wi-LAN's OFDM technology. (*Id.* at 10-11.)

Qualcomm objects to Wi-LAN's request arguing that its licenses and technology are not comparable to what is being asserted in the Texas Action. Qualcomm's licenses are relevant to what Qualcomm receives for its CDMA and OFDM patent portfolios, but Qualcomm contends that does not make them relevant to what Wi-LAN should receive for its two patents at issue in the Texas Action.

**A.     Qualcomm's CDMA Related Licenses and their Negotiation Histories**

Defendants in the Texas Action are CDMA licensees of Qualcomm. With respect to the *Georgia-Pacific* factors cited by Wi-LAN, the defendants' licenses with Qualcomm for Qualcomm's CDMA technology may be relevant to the determination of what the defendants would reasonably have paid Wi-LAN to practice the CDMA patent at issue in the Texas Action. The defendants use CDMA compliant Qualcomm chipsets in their accused products. They have licenses to Qualcomm's CDMA patents in relationship, at least in part, to the use of the Qualcomm chipsets in their products. Wi-LAN

---

[8] These 15 factors are commonly referred to as the "*Georgia-Pacific*" factors.

contends that those chipsets satisfy certain of the claim limitations at issue. The relationship of the Qualcomm CDMA licenses with the defendants to a reasonable royalty for Wi-LAN's '802 patent is, therefore, arguable. To the extent these licenses encompass more than the infringed claims however (i.e., provide for patent rights or cover products unrelated to the patent rights and products at issue in the Texas Action), they may not be probative of the value of the Wi-LAN patented invention. *ResQNet*, 594 F.3d at 869 (evidence unrelated to claimed invention does not support compensation for infringement). On balance, the potential probative value of the Qualcomm CDMA licenses with the party-defendants is not outweighed by the burden of production, and for purposes of discovery, they should be produced. It is the Court's understanding that the Qualcomm CDMA licenses with LG Electronics and UTStarcom have been produced and that Qualcomm does not object to the production of its license with Motorola. Consequently, Wi-LAN's motion to compel with regard to these license agreements is moot.

The objection to the production of Qualcomm's CDMA licenses with regard to all its other non-party licensees based on relevance is stronger. The Federal Circuit, in *ResQNet*, recently admonished trial courts that damages evidence must be carefully tied "to the claimed invention's footprint in the market place" and courts should not rely upon license agreements that are "radically different from the hypothetical agreement under consideration." *ResQNet*, 594 F.3d at 869, *citing Lucent Tech., Inc. v. Gateway*, 580 F.3d 1301, 1327-28 (Fed. Cir. 2009). Qualcomm has demonstrated that: (1) it has no standard CDMA license agreement; (2) each of its agreements are heavily negotiated based on the numerous factors including the scope of the rights sought and products covered; and (3) its portfolio is extensive and global and its rates reflect the size, coverage and importance of Qualcomm's world-wide patent portfolio and its stature in the wireless industry. (Lupin Declaration, ¶¶ 5-8, 18-20.) Qualcomm contends that the provisions and rates set forth in its CDMA agreements cannot be used for any sort of comparative purpose to support what a willing licensee would pay Wi-LAN for its CDMA patent and are irrelevant to Wi-LAN's hypothetical negotiation analysis. (Doc. No. 9-1 at 4.)

Wi-LAN does not disagree with Qualcomm's assessment of its leadership position or the scope of its patent portfolio. At the hearing on the motion, Wi-LAN argued that the Qualcomm licenses would give "context" and provide a "reference point" for Wi-LAN's hypothetical negotiation position.

Wi-LAN suggested that the Qualcomm licenses demonstrate an accepted rate for the licensing of CDMA technology, a platform from which Wi-LAN would present the reasonableness of its relative position. In so arguing, Wi-LAN acknowledged, at least tacitly, that licenses to the Qualcomm CDMA patent portfolio are not comparable to a license for the Wi-LAN '802 CDMA patent. There was no evidence that the numerous, global patents included in the Qualcomm licenses are analogous or comparable inventions to the Wi-LAN patent at issue, other than Wi-LAN's generic statement that they are for CDMA technology. Nor was there a showing that the scope of these CDMA licenses with a 150 or more non-party licensees, and the products and services covered by these agreements, are comparable or analogous to the scope of the devices accused of infringement in the Texas Action. Based on the record before the Court, Qualcomm's licenses for its CDMA patents with non-parties to the Texas Action have extremely little, if any, relevance to Wi-LAN's hypothetical negotiation for its CDMA patent with the defendants in the Texas Action.

As to the burden on Qualcomm of producing the responsive documents, although the requested production is optimistically characterized by Wi-LAN as a "narrow class of business contracts" that should be readily accessible and involve few individuals (Doc. No. 10-1 at 12-13), the evidence presented by Qualcomm demonstrated that production of these licenses and their negotiation histories would be extremely burdensome. The responsive production would span 20 years of licensing and encompass the review of millions of pages of paper and electronic documents, many of which are in storage. The agreements have long histories, and in some cases multiple amendments spanning years of on-going negotiations. Some licenses are the result of extensive litigation, and their negotiation histories involve confidential litigation strategy discussions. A large number of individuals would be involved in the search and production both within Qualcomm and from outside counsel who assisted in license negotiations. (Lupin Declaration, ¶ 10-14.) Additionally, since the agreements are not standard, but each has its own scope and history, it can be further anticipated that additional discovery, in the form of depositions, will be sought to interpret and appreciate the scope and context of each agreement, resulting in further burden to Qualcomm, a non-party.

Moreover, the requested agreements are the subject of nondisclosure and confidentiality provisions, which would require notice to be given to the non-party licensees prior to production to

afford those entities an opportunity to present objections to the production. (*Id.*, ¶ 9.)

Weighing the probative value of the Qualcomm CDMA licenses and sub-licenses and their negotiation histories in the Texas Action against the burden of the production on the non-party, Wi-LAN's motion to compel is **DENIED** and Qualcomm's motion to quash is **GRANTED**.

### B. Qualcomm's OFDM Related Licenses and their Negotiation Histories

Wi-LAN has requested Qualcomm's license agreements for its OFDM technology because they reflect royalties paid for technology comparable to Wi-LAN's OFDM technology. (Doc. No. 10-1 at 11.) Wi-LAN accuses the defendants in the Texas Action of infringing its '222 patent, directed to OFDM technology by making, selling, using or importing mobile handsets and/or other products compliant with the 802.11 standards. (Texas Complaint, ¶¶ 15, 17 and 19.) The 802.11 standards refer to a set of standards for carrying out wireless local network communications or what is commonly referred to as Wi-Fi.[9] Wi-Fi relates to a local very short-range wireless network (for example, within a building or selected rooms of a building). (Lupin Supp. Decl., ¶ 2.) Qualcomm has no active license agreements pertaining only to the 802.11 standards. (*Id.*, ¶ 3.)

Qualcomm's OFDM license agreements are not for the 802.11 standards, but relate to standards directed to wide area cellular telephone communications, which have far larger boundaries set by the particular service radius of the operator more akin to a cellular network. (*Id.*, ¶ 2.) These standards have not been widely-activated by cellular carriers. They are the LTE standard promulgated under a project operating under the name European Telecommunications Standards Institute ("ETSI") and WiMAX, standardized by the IEEE working group 802.16. (Doc. No. 21 at 2.) Qualcomm owns a substantial patent portfolio related to the 802.16 and LTE standards, with over 21,000 world-wide pending patent applications and patents. By entering into an OFDM license agreement with Qualcomm, the licensee obtains a world-wide nonexclusive license to the entire portfolio. (Lupin Supp. Decl., ¶¶ 6-7.) Qualcomm contends that these agreements also reflect Qualcomm's preeminance and significant patent holdings and are irrelevant to Wi-LAN's hypothetical negotiation for a license to its '222 patent.

Other than the assertion that the Qualcomm licenses are comparable because they involve

---

[9]Supplemental Declaration of Louis M. Lupin ("Lupin Supp. Decl."), Doc. 21-3 at ¶ 2.

OFDM technology, Wi-LAN has not demonstrated how the Qualcomm OFDM portfolio licenses involving different standards for a different technology are relevant to Wi-LAN's royalty analysis in the Texas Action. Nor has Wi-LAN demonstrated how Qualcomm's licensing rates under the 802.16 standard are relevant to Wi-LAN's compliance with its RAND obligations under the 802.11 standard.

The number of Qualcomm OFDM licenses and sublicenses implicated in the production of documents responsive to Wi-LAN's subpoena is substantially less than the CDMA-related document request. The confidentiality concerns, however, are the same. Having balanced the probative value of the information sought against Qualcomm's confidentiality interests, Wi-LAN's motion to compel is **DENIED** and Qualcomm's motion to quash is **GRANTED**.

This order does not in any way prohibit Wi-LAN from using any information publicly available about Qualcomm's licensing agreements or practices.

### C. Qualcomm's Motion for a Protective Order

In conjunction with its motion to quash, Qualcomm seeks a protective order barring all additional discovery efforts directed at Qualcomm's licenses or licensing practices. Qualcomm's motion to quash the subpoena at issue has been granted. Qualcomm's motion for a protective order as to future discovery is **DENIED**. As to any additional discovery directed at Qualcomm's licenses and licensing practices, the party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court must enforce this duty and impose an appropriate sanction, which may include reasonable attorney's fees, on a party or attorney who fails to comply. FED. R. CIV. P. 45(c)(1). Any future subpoenas served by Wi-LAN regarding Qualcomm's licenses or licensing practices will be reviewed with reference to this order and sanctions will be considered if appropriate.

**IT IS SO ORDERED**.

DATED: July 28, 2010

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge